IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

OCT 27 2014

David J. Bradley, Clerk of Court

LINDA J. DONNIE         *
                        *    H-14-3073
                        *
v.                      *    CIVIL ACTION NO: _____
                        *
CENTRAL UNITED LIFE     *

# ORIGINAL COMPLAINT

NOW COMES, **LINDA J. DONNIE**, and files this her Original Complaint against CENTRAL UNITED LIFE INSURANCE COMPANY ("CENTRAL UNITED"), and for grounds would show the Court as follows:

*Statement of the Case*

This suit alleges employment discrimination, harassment and retaliation based on race, pursuant to Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e, *et seq.*, as amended, and based on age, pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 621, *et seq.*, as amended.

*Jurisdiction and Venue*

This court has jurisdiction over this case based on federal question. Plaintiff has met all conditions precedent to filing this suit. Plaintiff filed a charge with the Equal Employment Opportunity Commission on July 4, 2013. A copy of the complaint filed with the EEOC is attached. Plaintiff received her Right to Sue letter on July 30, 2014. This suit is being filed within 90 days of Plaintiff receiving her Right to Sue letter. Venue is proper in the Houston Division of the Southern District of Texas, where Plaintiff resides, and where this cause of action arose.

1

*Parties and Service*

Plaintiff, LINDA J. DONNIE, is an African American woman over the age of 40 years, a resident of the State of Texas and a citizen of the United States who, at all times pertinent to this lawsuit, was very experienced and highly qualified for the position of Manager, Underwriting Department of Defendant, CENTRAL UNITED LIFE INSURANCE COMPANY, where she had worked from May 10, 2000 until she was summarily terminated on June 7, 2013.

Defendant, CENTRAL UNITED, is a corporation organized and existing under the laws of the State of Arkansas, and authorized to do business in the State of Texas.

*Statement of Facts*

1. Plaintiff was hired by Defendant on May 10, 2000 as Associate Manager of the Underwriting Department, and advanced to Manager of the Underwriting Department during her 13-year tenure with the company.

2. At the time of hire, Plaintiff had already had over 13 years of underwriting experience in the corporate world. The staff included one junior underwriter, then two years later, was increased to add an Underwriting Assistant.

3. By 2007, as business decreased, both of the staff positions under her management were eliminated and she became a one-person department, carrying an exceptional workload without adequate support or assistance. Plaintiff did not complain but, in yeomanlike fashion, maintained the department's professional standing and profitability for the company.

4. Prior to being hired by Defendant, Plaintiff had extensive experience (more than 14 years) as an underwriter of both life and health policies, professional education, with a Bachelors degree in Sociology. In addition to active member in professional organizations, she is a Fellow

of the Life Management Institute and past president, Associate of the Academy of Life Underwriters.

5. As an employee of Defendant, Plaintiff continued to maintain and improve her education and training in related fields, including CPR certification and health and wellness coach. In addition, Plaintiff took initiative, with the company's approval to provide a Monthly Health Bulletin Board as well as initiated and coordinated with United Healthcare a comprehensive and multi-faceted health and wellness program benefitting all employees, called: "Simply Engaged."

6. Being the main, most qualified and most experienced underwriting professional in the office, it always fell to Plaintiff to train others in underwriting, which she did willingly; little realizing that Defendant was devising a plan to train an underwriting team, which would not report to Plaintiff, but would ultimately take over and replace Plaintiff.

7. In 2007, Lee Ann Blakey, a White female, under 40 years old, came on board as Vice President of Claims, and was quickly promoted to Chief Operations Officer. Prior to Ms. Blakey's arrival, Ms. Donnie's underwriting decisions were respected and, more or less, she was supported professionally by Defendant. Her department of one remained profitable, continuing to operate and underwrite within company guidelines, and respected for its productivity, despite being under-staffed. Ms. Donnie consistently received excellent performance evaluations.

8. However, once Ms. Blakey joined the company, Ms. Donnie was treated differently and less favorably; she was frequently overridden in her decision making, her underwriting decisions were reversed as exceptions, her customer relations performance was questioned (without cause), her work was scrutinized and micro-managed, and she was presented in a bad light to agents, corporate and individual customers. Her professional work and decisions were no longer supported. Beside the arrival of Ms. Blakey, nothing had changed, and Ms. Donnie's

performance had remained consistent and profitable for the company. (It should be noted that Ms. Blakey admittedly had no underwriting experience or knowledge, no college or professional degree, and far less experience than Ms. Donnie in the insurance underwriting business).

9. In 2009, Defendant acquired a block of business in the Medicare Supplement (seniors) market, and despite Plaintiff's extensive experience in health underwriting, and loyal service in the related traditional market Plaintiff was not considered to head, or even work in, the new division. Marybel Lopez Huff (a Hispanic female, under 40 years old), was hired by Plaintiff as "lead underwriter" and assigned to the new Med. Supp. Division, and quickly promoted to manager with a staff and team to manage. Later Plaintiff was asked to train Marybel Lopez Huff to underwrite traditional lines of business

10. In early 2013, a Strategic Business Unit was formed, focusing on specific lines of health insurance business, well within the range of services that Ms. Donnie already provided, and staffed by people trained by Ms. Donnie. Ms. Donnie, still the main underwriter in the company, with over 27 years of experience in health insurance underwriting, never heard of the unit until it was launched, and was never given any opportunity to participate, at any level.

11. Still, as requested and required by Defendant, Ms. Donnie continued to be asked to train workers, and to sign off on their work; yet those workers were never placed under Ms. Donnie's supervision, but always reported to some other employee.

12. Ms. Lopez was promoted to Director, assigned to lead the underwriting unit, presented by the company as "the face of the underwriting department", given a staff, permitted to attend luncheons and dinners with agents and conduct prospective business marketing, and approved to attend conferences and conventions on behalf of the company. Despite training and de facto supervising some of Ms. Lopez' staff, Ms. Donnie was not allowed some of the same benefits,

and watched Ms. Lopez go past in level of compensation and level of management responsibility within the company.

13. After experiencing repeated acts of discrimination and hostile work environment, Plaintiff filed a grievance in the company. The company general counsel conducted a meeting with Plaintiff which was basically an interrogation session, and accusations against Plaintiff, culminating in a 90-day Performance Improvement Plan that Plaintiff was supposed to carry out. In other words, Plaintiff was punished and experienced further harassment for exercising her right to file a grievance, which was legitimate. This response by the company actually confirmed the very issues that Plaintiff complained of.

14. At the end of the 90-day plan, which Plaintiff carried out with exceptional ability, continuing to show high performance in her field, and for which Plaintiff received absolutely no feedback at all, she was summarily dismissed. The claim was that she had made a wrong underwriting decision more than a year earlier. (It should be noted that there are no wrong decisions in underwriting, since it's a matter of subjective professional judgment. The value and effectiveness of a professional underwriter is measured after the fact in terms of the volume or unanticipated claims and the risk/profit ratio reported after the fact). Plaintiff continued to have an excellent underwriting record for the entire time at CENTRAL UNITED, while daily making decisions within company-established guidelines.

*Cause of Action* – **Discrimination based on Race**

By treating Plaintiff, an African American, in a manner less favorable than similarly situated employees of lesser qualification, training and experience, and who were not African American, Defendant engaged in intentional employment discrimination based on race.

*Cause of Action* – **Discrimination based on Age**

By treating Plaintiff in a manner less favorable than similarly situated employees who were under 40 years old, while Plaintiff, a well-qualified employee was over the age of 40 years, Defendant engaged in intentional employment discrimination based on age.

### *Cause of Action* – Harassment

By continuing to deny Plaintiff opportunities, by undermining Plaintiff's efforts at productivity in overworking her, denying her department staffing, denying or refusing requests or applications to attend marketing luncheons and dinners and professional conventions, by undermining Plaintiff professionally in overriding her decisions arbitrarily and inconsistently (and not according to established company underwriting guidelines), by misrepresenting and mischaracterizing Plaintiff's ability and performance to agents, customers and prospective customers, by forcing Plaintiff to train workers who were then assigned to other managers, and in other ways, Defendant subjected Plaintiff to a hostile work environment.

### *Cause of Action* – Retaliation

By attacking Plaintiff's character and professional ability, and forcing her to perform under a Performance Improvement Plan, and ultimately terminating Plaintiff, solely in response to Plaintiff exercising her right to submit a legitimate grievance to the company, Defendant engaged in retaliation.

### *Damages*

Defendant should be made to respond in damages for its wrongful acts of discrimination, harassment and retaliation.

### *Attorneys Fees*

It was necessary for Plaintiff to hire attorney Ayesha G. Mutope-Johnson to represent her and her claims of violation of civil rights against Defendant in the previous proceedings with the

Equal Opportunity Employment Commission. Upon prevailing on her claims, Plaintiff seeks an award of any and all attorney fees incurred in the prosecution of her claim.

## *Prayer*

Plaintiff prays the Court, after due proceedings had, to enter orders as follows:

a. Declaring that Defendant has violated Plaintiff's civil rights and engaged in discrimination based on race and age;

b. Declaring that Defendant has violated Plaintiff's civil rights and subjected Plaintiff to a hostile work environment;

c. Declaring that Defendant has retaliated against Plaintiff;

d. Enjoining Defendant from further violating or abrogating Plaintiff's civil rights;

e. Reinstating Plaintiff in her job as Manager, Underwriting Department at Defendant;

f. Awarding Plaintiff compensatory damages as allowed by law, including back pay and front pay;

g. Awarding Plaintiff pre- and post-judgment interest as allowed by law;

h. Awarding Plaintiff attorneys fees and costs;

i. Granting such other and further relief to which Plaintiff shows herself entitled.

## *Jury Demand*

Plaintiff demands that her case be heard by a jury of her peers.

October 27, 2014.

Respectfully submitted,

*[signature]*

LINDA J. DONNIE
Plaintiff, *pro se*
16714 Glamis Lane
Houston, Texas 77084
Tel: 713-492-1242

ATTACHMENT

COPY OF COMPLAINT FILED WITH THE

EQUAL OPPORTUNITY EMPLOYMENT COMMISSION

ON JULY 4, 2013

R.J. Ruff Jr., Director
Equal Employment Opportunity Commission
Total Plaza
1201 Louisiana St. 6th Floor
Houston, Texas 77002

Dear Sir:

Please accept the following as a complaint for violations of my rights under the Fair Labor Standards Acts of 1938 (as amended).

My complaint is against Central United Life, which is also known as Manhattan Insurance Group, and David Harris Holdings (hereinafter referred to as 'company').

The company is located at 10777 Northwest Freeway, Houston, TX, 77092. The main phone number is 713-529-0045. There are, at least, 100 employees.

The issues and bases of my complaint are as follows:

STATEMENT OF COMPLAINTS

1. The company promoted a hostile work environment that caused me mental, emotional and physical harm.

2. The company denied me advancement and promotional opportunities based on my race, color and age.

3. The company terminated my employment in retaliation for my filing a grievance complaint.

SUMMARY OF COMPLAINTS

1. Hostile Working Environment

From 2009 and up to my termination from the company, I was subjected to an intimidating, oppressive and hostile work environment that was generated by the company's engendered conflict between myself and insurance agents; in particular, the Insurance Marketing Group of Ft. Worth, TX. The crux of the issue was the company's inconsistent application of official product guidelines used in determining the issuance, decline or rescission of an insurance policy.

Prior to the hiring of Lee Ann Blakey, who was eventually promoted to chief operations officer, my decisions as a 20 plus year professional were respected. The job of an underwriter is to make risk assessments on insurance applicants to protect the company from adverse risks. My decisions to approve or to deny an application was always based upon the risk factors present in light of the official company guidelines for a particular product. Of course, the agents in the field were not pleased if an application was denied because that was commission lost.

When an agent or agency complained of an application denial, Ms. Blakey would, in many of the cases, reverse my decisions as an 'exception.' Over time my decisions were so undermined, and, so many

1

exceptions had been made, that it became impossible to underwrite objectively. Similar cases were approved in one instance and denied in another. I was made to appear incompetent when in fact I was performing my duties at the highest professional standards. This intent to make me appear incompetent was the company's attempt to create justification for future discriminatory actions against me, as the totality of the record and evidence will show.

The company's inconsistent application of product guidelines, which also caused a timely delay in the performance of my duty, created an environment of hostility between myself and agents. Rather than communicate to the agent or agency that I was handling policies in good faith and within the company's stated guidelines, and that she was making exceptions to the guidelines, as well as holding applications for weeks before making a decision, Ms. Blakey treated me as the problem – and encouraged the agents to believe same - and suggested that I needed to improve my relationship with the agents.

This environment of intimidation and hostility caused me mental, emotional and physical harm.

    2.   Discrimination based on Race and Age

I was hired in May 2000 as Associate Manager of the Underwriting Department. My staff consisted of one (1) Junior Underwriter, Chris Kyle. Two years later, as business increased, another person was hired, Gloria Harris, whom I trained as an Underwriting Assistant.

By June 2007 business was decreasing and Mr. Kyle and Ms. Harris were let go. I became a one (1) person department. Consequently, I was always overwhelmed with the work load but was denied the opportunity to hire an assistant. Employees from the New Business Department were assigned to help me and were trained by me – but they did not report to me. I was told we would grow the underwriting department again when business increased.

In 2009, the company acquired a Medicare Supplement (seniors market) block of business and rather than growing the existing underwriting department, a separate New Business/Underwriting unit was established. As the Manager/Chief Underwriter, I had no involvement in the interviewing or hiring in this new unit, nor had any knowledge that it was being formed. The company hired Marybel Lopez to underwrite the product. Ms. Lopez was quickly promoted to manager and permitted to hire several new employees to underwrite the Medicare product.

In 2010, I was asked to train Ms. Lopez in 'Life' underwriting, of which she had no prior experience. I was told by Sr. management that she would assist our Senior Life underwriter, Jorge Hernandez, in the international market. She was also exposed to "traditional" health underwriting in 2011. By 2012, Ms. Lopez was involved in all lines of business yet I remained a one person department and was relegated to underwriting/working the majority of products. Though I was the Manager of Underwriting and for 13 years officially referred to as 'Chief Underwriter, Ms. Lopez was the one called on to meet with agents, attend lunches and dinners and conventions. It had become obvious to me and others that while I was being undermined and relegated to only training others, while Ms. Lopez was being groomed to assume more responsibility and authority to "manage" others, including me!

Ms. Lopez is in her early thirties and I just turned 60 years of age. I am African-American; hold a B.A. degree, am a Fellow of the Life Management Institute (FLMI), and an Associate of the Academy of Life Underwriters (AALU). I've spent the past 27 years in Life and Health Underwriting, beginning my career in 1984 as a writing agent for Prudential insurance. Ms. Lopez has basically one (1) year of full-time Life

2

underwriting experience and has not taken any advanced underwriting courses. Although she has been a manager over the Medicare Supplement unit for 3 years, Medicare Supplement is the easiest product to underwrite. It is a guaranteed issue during the enrollment period.

It is clear and apparent by the foregoing that the company promoted a hostile work environment which preceded the clear and blatant intent to demote me under Ms. Lopez, who had extremely less qualifications - due to my race, color and age.

3. Retaliation

On January 18, I filed a grievance complaint through the Human Resources Department of Manhattan Life complaining of a 'hostile working environment' and 'discriminatory practices' within the company.

The initial response to my complaint was a grievance hearing on January 25, 2013 with the company's attorney, John McGettigan. I was never interviewed by Human Resources.

The first words of Mr. McGettigan was, "the company and I both view you as a valued employee." However, the interview was conducted in a manner that suggested that the company had a complaint against me – and not as a hearing of my complaint. As a response to my complaint of lesser experienced employees being elevated over me, Mr. McGettigan suggested that I lacked the skills and experience. That assertion is utterly refuted by my past performance reviews, academic and industry education, employment history, and years of experience….. An audio copy of the hearing is enclosed.

The result of the hearing was that I was placed on a 90 day Performance Improvement Plan (PIP). The PIP was, in effect, reprimanding me for the very thing I complained of as causing a hostile working environment – the company's engendered conflict between myself and a particular insurance agency. Foremost among the requirements in the PIP was that I needed to improve my 'relationship with the agents.' Prior to my complaint I was not on a Performance Improvement Plan; was not told that one was impending for any reason; and annual reviews were not due for another 6 months.

The PIP was completed on May 20, 2013. However, I received no communications, written or verbal, regarding my performance during this period. As a matter of fact, my intention was to submit my executive summary and copy of resume to revisit my experience and education at the end of PIP and before our annual reviews in May.

On June 6, 2013, I received an email from John McGettigan requesting that I meet with him and LeAnn Blakey the next day, June 7, presumably to discuss a policy that I rescinded in the normal performance of my duties in late 2012. It should be noted that in my 13 years with the company this was the first time that the company attorney wanted to discuss a rescission with me. My decision on this policy were based on the existing product guidelines at the time, and was approved by Marylou Rainey, the Compliance Officer, who was herself terminated about a month prior to me because of her own difficulties with same Lee Ann Blakey.

We met around 9 AM on the morning of June 7. During this meeting the old and persistent issue of 'relationship with agents' surfaced, as well as suggesting that I wasn't following the (inconsistent) product guidelines. Any result or finding the company obtained from the Performance Improvement Plan were never discussed. I was not given a verbal or written result. At approximately noon of the same

3

day I was informed that my services with the company were no longer required. The official reason, to the best of my knowledge, was that I was not following the company's (product) guidelines.

*Linda C. Donnie*

Linda J. Donnie
16714 Glamis LN
Houston, TX 77084
281-345-2719

4